# United States District Court

SOUTHERN DISTRICT OF FLORIDA

FILED by ___ D.C.
MAR 23 2000
CLARENCE ...
CLERK U.S. DIST. CT.

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

Jesus Jesse Vega,
Alipio Herrera, and
Lidia Herrera

CASE NUMBER: **00-4060**

(Name and Address of Defendant)

**MAGISTRATE JUDGE**
**SNOW**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about **March 6, 2000** in **Broward** county, in the **Southern** District of **Florida** defendant(s) did, (Track Statutory Language of Offense)

**Conspire to Commit an Armed Robbery**

in violation of Title **18** United States Code, Section(s) **371, 1951(a)**

I further state that I am a(n) **Special Agent** and that this complaint is based on the following facts:
*Official Title*

**See Attached Affidavit hereby incorporated by reference as if fully restated herein.**

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

_Signature of Complainant_

Sworn to before me and subscribed in my presence,

**Special Agent**
**Federal Bureau of Investigation**

March 23, 2000 at Ft. Lauderdale, Florida
Date                          City and State

Chief Magistrate Judge Lurana S. Snow
Name & Title of Judicial Officer

_Lurana S. Snow_
Signature of Judicial Officer

**00-4060**

AFFIDAVIT


MAGISTRATE JUDGE
SNOW

I, Erik C. Miller, being duly sworn, state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) assigned to the Miami, Florida Field Division and have been so employed since July 21, 1996. As a Special Agent with he FBI, I have been responsible for the investigation of numerous violations of law, including robberies of commercial institutions. I base the information in the following affidavit upon information supplied to me during the course of my official duties with the FBI.

2. On Monday, February 28, 2000, Special Agent Linda S. Dees of the Florida Department of Law Enforcement (FDLE) was contacted by Arturo Luis Abascal, a cooperating defendant in a case pending before the Honorable Ursula Ungaro Benages. Abascal is awaiting sentencing on March 24, 2000, and hopes that his cooperation in this, and other matters will positively affect his sentence.

3. Abascal was released from the Federal Detention Center in Miami, Florida in September of 1999 by posting a bond and with the knowledge of Assistant US Attorney Theresa Van Vliet. The purpose of agreeing to the bond was to allow Abascal to provide substantial assistance in narcotics related or other criminal activity.

4. During a debriefing of Abascal, he admitted to and outlined multiple home invasion and business office robberies in which he has been a participant from approximately 1996 up until approximately 1998. Abascal told FDLE agents that during the course of these robberies, guns, police clothing including badges and blue lights were used. Abascal said he has never been involved with any robberies in the past with ALIPIO HERRERA and is unaware if HERRERA has ever committed any, however, HERRERA does know about Abascal's robbery history.

5. On February 28, 2000, Abascal told SA Dees that he was contacted by a subject ALIPIO HERRERA who was planning to do a robbery of a courier/delivery person for a large sum of money. Abascal told SA Dees that HERRERA lived in Coral Gables, Florida and Abascal was to meet with HERRERA on Tuesday evening.

6. On Tuesday, February 29, 2000, Abascal met with FDLE Special Agents A.J. Pineda, and Linda S. Dees. Abascal made a controlled recorded telephone call to HERRERA at telephone facility (305) 387-7256, which is believed to be a business cellular telephone for Private Couriers, a business where HERRERA and Abascal are both employed. Abascal told HERRERA that he would be at HERRERA's residence later this date.

7. At approximately 8:00 PM on Tuesday, February 29, 2000, Abascal went to the residence of ALIPIO HERRERA and his wife LIDIA HERRERA, located at 119 Santillane, Apartment #6, Coral Gables, Miami-Dade County, Florida. During this tape-recorded meeting, HERRERA told Abascal that a meeting would be held at HERRERA's residence on Sunday afternoon to go over the plans of the robbery of the courier. HERRERA stated that he had prepared addresses and diagrams of the bank where the courier would be robbed. HERRERA said that guns and stun guns would be used to overcome the courier in order to grab the bag, which contained a large sum of money.

8. HERRERA told Abascal that he wanted "Superboy" to get a car to be used during the robbery and subsequent get-away. HERRERA also told Abascal that there would be 2 guns and 2 stun guns to be used by Abascal and a subject identified to Abascal as "Gordo". Additionally, HERRERA told Abascal that the information regarding the intended target/victim, the money and the route to be used by the target/victim was being supplied by an unidentified friend of HERRERA's who is a supervisor of the courier service where the victim/target is employed

HERRERA said that this unidentified supervisor would not be attending the meeting on Sunday. HERRERA also told Abascal that the target/victim makes his last pickup at the Pontiac car dealership located at Sheridan and 441, and that the target/victim carries the money to the 1st Union Bank located at 4600 Sheridan Street, Hollywood, Broward County, Florida.

9. Abascal knows "Superboy" to be the nickname of a subject identified as Alex Pantoja, who is a loan manager of a business and has access to various cars from an unknown car dealership.

10. During this consensually recorded meeting, HERRERA also told Abascal that on Sunday, they would get everything ready and together including traveling to a store of a person known to HERRERA who will be supplying the two stun guns.

11. On Wednesday, March 1, 2000, a recorded telephone call was placed by Abascal to HERRERA at telephone facility (305) 446-5225, which is subscribed to ALIPIO HERRERA, at the residence located at 119 Santillane, Apartment #6, Coral Gables, Florida. This telephone call was placed at the direction of Special Agent A. J. Pineda. During this consensually recorded telephone call, Abascal tells HERRERA that he (Abascal) has not had a chance to call Alex and tells HERRERA to call Alex to let him know what's up, and HERRERA tells Abascal okay.

12. On Sunday, March 5 2000, at approximately 11:30 p.m. HERRERA and Abascal met at HERRERA's residence located at 119 Santillane, Coral Gables, Miami-Dade County, Florida. Audio and visual surveillance was utilized during this meting. Present during this meeting was HERRERA, LIDIA HERRERA and Abascal. This meeting was held at HERRERA's request and HERRERA advised Abascal that he had obtained a Taser stun gun, handcuffs, and a firearm to use in the robbery. HERRERA subsequently showed Abascal a firearm, described as a 380 caliber and a stun gun. During the conversation LIDIA HERRERA

Asks questions concerning the stun gun and what effects it has. HERRERA also advised that the armed robbery was definitely going to occur on Monday, March 6, 2000 at the Pontiac dealership in Hollywood on US 441.

13. HERRERA advised Abascal that he (HERRERA) would pick up Abascal in the morning in HERRERA's truck and HERRERA would drive to the scene of the robbery and that he wanted Abascal to actually rob the courier while HERRERA waited in the getaway vehicle. This was a consensual recorded conversation.

14. On Monday, March 6, 2000 at 8:25 AM HERRERA picked up Abascal at Abascal's relatives located in Hialeah, Fla. in HERRERA's truck. Audio and visual surveillance was established and maintained on HERRERA and Abascal by FDLE agents.

15. HERRERA and Abascal then drove to South Miami and obtained a stun gun. HERRERA then drove with Abascal back to HERRERA's apartment where HERRERA obtained a .380 semi-automatic pistol and handcuffs. HERRERA and Abascal then drove north on Interstate 95 to the exit at Sheridan St, Hollywood, Broward County, Fla. whereupon HERRERA's vehicle was stopped by FDLE agents and HERRERA was arrested.

16. Subsequent to the arrest of HERRERA a search of the vehicle revealed a pair of black handcuffs, a Bryco Arms .380 semi automatic pistol, and Muscleman 300,000 volt stun gun. After Miranda Warnings, HERRERA gave a full taped statement concerning the above, including information on the defendant, JESSE VEGA, who was the inside connection at the courier service. Further, HERRERA agreed post arrest/post Miranda to make a controlled phone call from the FDLE Broward Field Office to JESSE VEGA.

17. At approximately 4:00 p.m. a controlled and recorded telephone call was placed by HERRERA at the direction of Special Agent Pineda. During this conversation, HERRERA tells

VEGA "done deal", to which VEGA replies "already you got the fat man?" and HERRERA states "yes". HERRERA continues by telling VEGA "you should of seen the guy cry bro". VEGA replies "fat man, I told you". The conversation ends with VEGA telling HERRERA he would see HERRERA later.

18. On March 6, 2000, JESUS JESSE VEGA was arrested at his residence located at 931 SW 87th Avenue, Pembroke Pines, Florida by FDLE Special Agent A.J. Pineda. VEGA was read his Miranda warnings by SA Pineda. During a post Miranda statement, VEGA told SA Pineda admitted receiving a telephone call from HERRERA that afternoon but denied that the conversation was about the alleged robbery.

Lydia Herrera's PC

19. On March 6, 2000, LIDIA HERRERA voluntarily came to the FDLE Broward Field Office after being advised that her husband, ALIPIO HERRERA had been arrested. LIDIA HERRERA was subsequently arrested by FDLE SA A.J. Pineda and read her Miranda warnings. LIDIA HERRERA gave a post Miranda statement in which she told SA Pineda that she saw the tazer gun that was going to be used in the robbery, right after it was purchased by her husband and she also knew that it had stopped working and was going to be exchanged for a new one by her husband and Abascal on the morning of March 6, 2000.

20. LIDIA HERRERA admitted to SA Pineda that she was in fact present during the meetings which occurred between her husband and Abascal, at the HERRERA residence, but denied that she participated in the conversations concerning the planning of the robbery or the plan to count the money after the robbery.

21. LIDIA HERRERA also said in the post Miranda statement to SA Pineda that their share of the money was going to pay bills, build a home that they always wanted to have and

help her daughter and friends with their bills

22. LIDIA HERRERA also told SA Pineda that prior to her husband leaving their residence on the morning of March 6, 2000, to do the armed robbery she observed a firearm, described as silver in color, that he was to carry during the commission of the robbery.

23. LIDIA HERRERA also admitted to SA Pineda that prior to the armed robbery she was aware that there was an inside contact at the courier service known to her as VEGA, that was providing inside information on the couriers route and the approximate amount of money that the courier may carry. LIDIA HERRERA also said that her husband had received several cell phone calls regarding that inside information on the couriers.

FURTHER AFFIANT SAYETH NAUGHT

Erik C. Miller, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me
this 28nd day of March, 2000 at
Ft. Lauderdale, Florida

Lurana S. Snow
Chief United States Magistrate Judge